## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| SCOTT MCCANDLISS, | ) | |
| DMIDRIY ABRAMYAN, ABDIKADIR | ) | |
| AHMED, AHMED KATUN AHMED, | ) | |
| AHMED HASSAN, BEN STEWART | ) | |
| ROUNTREE, FAHEEM IQBAL | ) | |
| QURESHI, ANTHONY D. LOGAN, | ) | Civil Action File No. |
| MOHAMED ABDULLE, HAMOUD S. | ) | 1:14-03275-WSD |
| ALDAHBALI, JAMAL ABDI, ABDILAHI | ) | |
| AWALE, MOHAMED A. HUSSEIN | ) | CLASS ACTION |
| and all others similarly situated, | ) | |
| Plaintiffs. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UBER TECHNOLOGIES, INC., | ) | |
| RASIER, LLC | ) | |
| and | ) | |
| KEITH RADFORD, AHMED SIMJEE, | ) | |
| JOSHUA GANTT, LESLIE GILMARTIN | ) | |
| BRIAN GIQUEL, CHRISTOPHER BOSAK, | ) | |
| CHRISTOPHER JOHNSON, KEVIN | ) | |
| BUTTIMER, DANIEL ANDERSON, JOHN | ) | |
| STETTNER, RACHEL PIETROCOLA, | ) | |
| JOSH VARCOE, FABIAN FERNANDEZ, | ) | |
| AMINUR CHOUDHURY, SEID SHEK, | ) | |
| ABEBE TESFAYE, SAMUEL WORKU, | ) | |
| JEAN RICHARD PIERRE, ALEXANDER | ) | |
| AGBAERE, AYODELE OKPODU, | ) | |
| BELAY DAGNEW, individually and | ) | |
| all others similarly situated, | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

1

Table of Contents to the Second Amended Complaint

Background…………………………………………………………………4

Parties and Jurisdiction……………………………………………………8

Class Action Allegations……………………………………………………11

Additional Facts…………………………………………………………..18

Count I - Tortious Interference with Business Relations and Conspiracy……….27

Count II – Public or, Alternatively, Private Nuisance ………...…………...……36

Count III – Punitive Damages……………………………………………39

Count IV - Unjust Enrichment……………………………………………40

Count V – Bad Faith………………………………………………………42


Ad Damnum Clause…………………………………………………………42

COME NOW, SCOTT MCCANDLISS, DMIDRIY ABRAMYAN, ABDIKADIR AHMED, AHMED KATUN AHMED, AHMED HASSAN, BEN STEWART ROUNTREE, FAHEEM IQBAL QURESHI, ANTHONY D. LOGAN, MOHAMED ABDULLE, HAMOUD S. ALDAHBALI, JAMAL ABDI, ABDILAHI AWALE, MOHAMED A. HUSSEIN on behalf of themselves and all others similarly situated ( "Plaintiffs" and/or "Plaintiff Class") and pursuant to Rule 15 (a)(2) of the Federal Rules of Civil Procedure files with leave of Court, this Second Amended Complaint against UBER TECHNOLOGIES, INC., and RASIER, LLC (collectively referred to as "Uber Defendants") and a Class of Atlanta Uber managers and drivers represented by KEITH RADFORD, AHMED SIMJEE, JOSHUA GANTT, LESLIE GILMARTIN, BRIAN GIQUEL, CHRISTOPHER BOSAK, CHRISTOPHER JOHNSON, KEVIN BUTTIMER, DANIEL ANDERSON, JOHN STETTNER, RACHEL PIETROCOLA, JOSH VARCOE, FABIAN FERNANDEZ AMINUR CHOUDHURY, SEID SHEK, ABEBE TESFAYE, SAMUEL WORKU, JEAN RICHARD PIERRE, ALEXANDER AGBAERE, AYODELE OKPODU, SAMI MAGESHA, BELAY DAGNEW (hereinafter referred to as "Defendant Class") showing the Court as follows:

3

## BACKGROUND

1.

To ensure that the public has access to safe and uniform means of vehicle-for-hire transportation, the City of Atlanta has developed a number of ordinances and regulations to protect the riding public.  Taxi companies and drivers must abide by these ordinances as well as rules and regulations, promulgated over decades, designed to protect consumers, ensure public safety, safeguard competition, and ensure non-discriminatory services.  Taxi companies and drivers have invested significant capital and resources to develop systems and infrastructure that ensures regulatory compliance and provide adequate consumer protections. The State of Georgia also issues laws, rules and regulations for the registration and operation of limousines and limousine companies which operate in the City of Atlanta.

2.

The City of Atlanta issues a finite number of taxi medallion licenses, called **a CPNC** *(Certificate(s) of Public Necessity and Convenience)*, each associated with a unique taxi number. The CPNC medallions have been specially authorized by O.C.G.A § 36-60-25 which established them with

all property rights including conveyance and ownership. A taxicab may not legally operate in Atlanta without such a validly issued CPNC license. The CPNC licenses are constitutionally protected property. Additionally, limousines and limousine companies may not operate in Atlanta without proper registration and licensing and only certain large vehicles qualify as limousines or limousine carriers. The only other licensed vehicle for hire in the City of Atlanta prior to July 1, 2015 was the horse-drawn carriage. This class action lawsuit involves the furnishing of rides to the public by Defendants prior to July 1, 2015 which begin in the city limits of Atlanta and the Atlanta airport. Other transportation originating outside the city limits of Atlanta is not the subject of this lawsuit.

3.

Uber and the Defendant Class began operating a fleet of "vehicles for hire" in the City of Atlanta in the summer of 2012.  These vehicles operated unlicensed in the City of Atlanta until July 1, 2015. Uber actually has referred to itself as "Uber Taxi". Its "Uber Black" vehicles attempt to operate as limousines but do not charge fares at prearranged amounts or maintain required trip reports. Uber vehicles registered as limousines violate the laws of the State of Georgia and the City of Atlanta by charging fares at the end of the trip based on mileage and

distance using the "smartphones" rather than prearranged amounts as required by law thus acting as taxicabs. Uber also furnishes other regular smaller vehicles through UberX that are privately owned vehicles that are not registered as vehicles for hire with any agency and have not attempted to comply with any registration. The Defendants have ignored and violated the rules and ordinances of the City of Atlanta including Atlanta Taxi Ordinances and operate without any CPNCs. Uber and Rasier operate as a quasi-taxicab business as they advertise and solicit business for their drivers, dispatch the calls and charge customers via credit cards based on measured time and calculations of mileage through the use of GPS and "smartphones". The Uber Defendants advertised by comparing their rates against those of taxicabs rather than as a new unauthorized form of travel. The Uber Defendants directly attack taxicabs and represent themselves as competition for taxicabs with much lower rates.

4.

The Uber Defendants and the Defendant Class have interfered with the Atlanta Bureau of Taxicabs' (the "Bureau") and the State of Georgia's business relationship with the entire Plaintiff Class by flooding the market with unlicensed, unauthorized vehicles for hire and making it impossible for the Bureau or the State of Georgia to protect their property rights and licensing rights.

6

5.

Defendant Keith Radford managed this network of unlicensed vehicles in Atlanta on a daily basis on behalf of the Uber Defendants.  Mr. Radford knowingly interfered with Plaintiffs' exclusive rights to operate taxicabs in the City of Atlanta by placing hundreds of unlicensed drivers on the streets of Atlanta to accept fares without a CPNC or other authorization and failed to pay sales taxes.

6.

As a result, the Uber Defendants and the Defendant Class have damaged the property values of the CPNCs. Their combined interference with Plaintiffs' contractual and property rights which provide for a finite number of taxicabs and vehicles for hire in the City of Atlanta lessened the value of CPNCs to their owners and/or the taxi drivers who pay weekly and/or monthly rents for their use. Additionally, the Uber Defendants and the Defendant Class interfered with the Plaintiff Subclass of Taxi Drivers' businesses in the City of Atlanta by accepting fares and providing transportation beginning or originating in the city limits of Atlanta resulting in lost fares and revenues to the Plaintiff Subclass.  This lawsuit does not seek enforcement of any laws by any governmental agency or court but seeks monetary damages from Defendants as a result or violations of city

ordinances and the laws of the State of Georgia including statutory and common law for nuisance and tortious interference with business relations.

## PARTIES AND JURISDICTION

7.

Plaintiffs    SCOTT    MCCANDLISS,    DMIDRIY    ABRAMYAN, ABDIKADIR AHMED, AHMED KATUN AHMED, AHMED HASSAN,  BEN STEWART  ROUNTREE,  FAHEEM  IQBAL  QURESHI,  ANTHONY  D. LOGAN,  MOHAMED ABDULLE, HAMOUD S. ALDAHBALI, JAMAL ABDI, ABDILAHI AWALE, MOHAMED A. HUSSEIN are all residents and citizens of Fulton County and/or the State of Georgia.

8.

Defendant UBER TECHNOLOGIES, INC.(hereinafter referred to as "Uber") is a foreign corporation organized under the laws of the State of Delaware and at all times relevant to this action controlled and operated its wholly owned subsidiary/division,  RASIER, LLC as well as all technology used to arrange rides for and collect money from customers in the City of Atlanta, Georgia. It maintains

an office in the City of Atlanta and is subject to jurisdiction pursuant to Georgia's Long Arm Statute, O.C.G.A. § 9-10-90 et seq.  It has been properly served through its registered agent, National Registered Agents, Inc., 160 Greentree Dr. Ste 101, Dover, Delaware 19904, pursuant to O.C.G.A.§ 9-10-94. Uber is also registered with the Secretary of State in Georgia as Uber Technologies (Ga), Inc. since there is a Georgia corporation with the same name. Proper service was performed on it as well.

9.

Defendant RASIER, LLC (hereinafter referred to as "Rasier") is a foreign corporation which is registered to do business in the State of Georgia and maintains a place of business in Fulton County, Georgia. It has been properly served through its registered agent, National Registered Agents, Inc. located in Fulton County, Georgia at 1201 Peachtree Street, NE, Atlanta, Ga. 30361.

10.

UBER TECHNOLOGIES, INC. and RASIER, LLC, (collectively referred to as  "Uber Defendants")  have in concert and conspiracy acted with one another and all members of the Defendant Class to damage Plaintiffs, the Plaintiff Class and Plaintiff Subclasses as set forth herein and below.

11.

Defendants KEITH RADFORD,  AHMED SIMJEE, JOSHUA GANTT, LESLIE GILMARTIN, BRIAN GIQUEL, CHRISTOPHER BOSAK, CHRISTOPHER JOHNSON, KEVIN BUTTIMER, DANIEL ANDERSON, JOHN STETTNER, RACHEL PIETROCOLA, JOSH VARCOE, FABIAN FERNANDEZ, AMINUR CHOUDHURY, SEID SHEK, ABEBE TESFAYE, SAMUEL WORKU, JEAN RICHARD PIERRE, ALEXANDER AGBAERE, AYODELE OKPODU, SAMI MAGESHA, BELAY DAGNEW are all residents and citizens of Fulton County and/or the State of Georgia. They have each intentionally acted in concert with the Uber Defendants and conspired to damage Plaintiffs, the Plaintiff Class and Plaintiff Subclasses as set forth herein and below.

12.

It is believed that over 95% of the members of the Plaintiff Class and all of the Defendant Class defined below are residents and citizens of the State of Georgia.  All of the individual persons named as Plaintiffs or Defendants are residents of the State of Georgia.  The actions giving rise to this Second Amended Complaint occurred in the City of Atlanta, Fulton County, Georgia.

13.

Jurisdiction and Venue are proper in the Superior Court of Fulton County, Georgia.  There are no federal causes of action or issues in this class action lawsuit. Defendant Uber removed this class action to the District Court of the Northern District of Georgia pursuant to the Class Action Fairness Act. Plaintiffs deny this jurisdiction or venue is proper and a Motion to Remand the case back to the Superior Court of Fulton County, Georgia is presently pending.

## CLASS ACTION ALLEGATIONS

14.

The Plaintiff Class is defined as all owners of *at least one* **CPNC** *(Certificate(s) of Public Necessity and Convenience)* and/or drivers of a licensed taxicab in the City of Atlanta via a CPNC since August 24, 2012 until July 1, 2015 ("the Class")[1] with the following subclasses:

(a) Subclass 1:   All persons, firms, corporations or other entities who own or have owned at least one **CPNC** (Certificate(s) of Public Necessity and Convenience);

---

[1] Specifically excluded from any of the Classes are all judges, clerks, assistants and other court personnel who have any involvement with the handling of this matter and any government entities.

(b) Subclass 2:   All persons who are or have been licensed taxicab drivers in the City of Atlanta with a **CPNC** (Certificate(s) of Public Necessity and Convenience);

15.

The Defendant Class is defined as all persons, firms, partnerships, corporations or other entities which have owned and/or operated any vehicle for the Uber Defendants which charged passenger(s) and received payment(s) for any rides based on measured time, distance and mileage originating/beginning in the City of Atlanta from August 24, 2012 until July 1, 2015.[2] Each member of the Defendant class has acted intentionally in operating unlicensed vehicles for the Uber Defendants and acted in concert and conspired with the Uber Defendants to damage Plaintiffs, the Plaintiff Class and Plaintiff Subclasses as set forth herein and below.

16.

The maintenance of this lawsuit as a class action is authorized by O.C.G.A. 9-11-23 b (1) (B) and b (3). Alternatively, the maintenance of this lawsuit as a class action is authorized by Fed. Rule Civ. P.  23 b(1) (B) and b (3).   Many of the legal issues to be decided will be dispositive of the interests of the Class and

---

[2] Specifically excluded from the Defendant Class are any members of Plaintiff Class and any member not a resident of Georgia on September 5, 2014.

Subclasses and substantially impair their ability to protect their interests. Plaintiffs seek disgorgement of all fares received by the Uber Defendants and its drivers for fares originating in the City of Atlanta and charged based on measured mileage, distance and time; other damages against the Uber Defendants and the Defendant Class including loss in value and rental values of CPNCs as allowed by law; punitive damages and, attorneys' fees and expenses.

17.

Each of the named Plaintiffs is a CPNC owner and/or renter.  All have (a) lost fares or income as the result of the Uber Defendants and the Defendant Class; (b) suffered diminution of the value of their CPNCs; and/or, (c) suffered lost rental values of their CPNCs. Their claims are typical of the claims of all Class members and the respective Subclass members.

18.

According to public records, the City of Atlanta has issued approximately 1600 CPNCs. There are over 2500 licensed taxicab drivers and renters of CPNCs. The Class and subclasses are so numerous that joinder of all members is impracticable. The Defendant Class is believed to include over 1100 members. The Defendant Class can easily be identified and located through Uber's records. All members of the Defendant Class are residents and citizens of the State of Georgia.

Uber has provided legal counsel to several of the named representatives of the Defendant Class when charged with violations of the City of Atlanta regulations for taxicabs and limousines and provide legal counsel in this action. The named representatives will adequately protect the interests of the Defendant Class.

19.

The named Plaintiffs understand the responsibilities and duties required of them as class representatives. They do not possess any conflict of interest with other class members or claims which are antagonistic to other class members. They will vigorously prosecute this action against the Uber Defendants and the Defendant Class. Plaintiffs' attorneys are experienced, well qualified, respected members of the legal community. They have the resources to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class and Subclasses.

20.

There are numerous questions of law or fact common to the Class and/or subclasses, which include:

a. Whether there has been a loss in value of the CPNCs as the result of Uber's conduct;

b. Whether the Uber Defendants and the Defendant Class have charged and received fares based on measured time, distance and mileage *retrospectively* that originated in the City of Atlanta and the total amount and/or profits of such fares;

c. Whether the Uber Defendants and the Defendant Class have operated as limousines, limousine carriers, taxicab companies and/or taxicabs in the City of Atlanta;

d. Whether the conduct, plans, policies, common schemes and actions of the Uber Defendants and the Defendant Class in charging and collecting fares in any manner it chooses without regard to the Rules and Regulations of the City of Atlanta or the State of Georgia from August 2012 until July 1, 2015 constituted a public nuisance specially damaging the Plaintiff Class or a private nuisance which damaged the Plaintiff Class;

e. The conduct, plans, policies, common schemes and actions of the Uber Defendants and the Defendant Class in their failure to comply with all safety policies and regulations of the City of Atlanta or the State of Georgia;

f. The total amount of all charges and/or profits for fares collected by the Uber Defendants and the Defendant Class originating in the City of Atlanta and the

proper methods of allocation and reimbursement to the Plaintiff Class and the respective subclasses;

g.  The liability of the Uber Defendants and/or the Defendant Class;

h.  Damages, types of damages and amount of damages that are common to the class. For example it is anticipated that the amount of damages for diminution in values and rental value of the CPNC's may be the same amount for each class or subclass member and/or can be determined by the same analysis for each;

i.  The total amount of fares collected by the Uber Defendants and the Defendant Class and the amount to be disgorged is common to all Subclass 2 members;

j.   Whether the Defendants' conduct interfered with Plaintiffs various business relationships as alleged; and,

k.   Additional issues to be defined after a class discovery period.

21.

The issues set forth in the paragraph above predominate over any questions affecting only individual members of the Class and/or subclasses.  A class action is superior to any other method for the fair and efficient adjudication of this controversy.

22.

The monetary amounts of the individual charges collected by Uber Defendants and the Defendant Class are relatively small, making it unlikely or financially impossible for the Class and/or subclass members to proceed individually. Members of the Class and/or subclasses have little or no interest in controlling the prosecution of separate actions.

23.

Plaintiffs and Plaintiffs' counsel are not aware of any litigation relating to this specific controversy which has been commenced by any members of the class. It is desirable to concentrate this action in one state forum so that any adjudication made will be consistent.

24.

Uber is in possession of the necessary financial records of payments from credit cards to calculate damages and fares originating in the City of Atlanta. This action is extremely manageable and few difficulties are anticipated.

# ADDITIONAL FACTS

### 25.

In Georgia, there have been two primary categories of vehicles for hire: taxicabs and limousines.[3] Both types of vehicles may be hired by individuals to pick up and carry passengers to their chosen destinations.

### 26.

Both the taxicab (Taximeter-Cabriolet, Hackney Carriage, etc.) and the limousine (Stage coach, livery carriage, etc.) have been regulated in various jurisdictions since both were still predominately horse drawn. One of the purposes of these regulations was to clearly define the separate roles and uses of each type of vehicle for hire.

### 27.

In Georgia, prior to July 1, 2015, taxicabs were primarily regulated by local jurisdictions, while limousines and limousine carriers were regulated by the Georgia Department of Public Safety and the State of Georgia.

---

[3] New laws were enacted by the State of Georgia effective July 1, 2015 creating a new category for ride share companies which Uber now claims includes it and its drivers. Accordingly, this new category demonstrates Uber has been operating outside legal requirements before July 1, 2015.

28.

Pursuant to O.C.G.A.§ 40-1-151(5): "'Limousine carrier' means any person

owning or operating a *prearranged* service regularly rendered to the public by

furnishing transportation as a motor carrier for hire, not over fixed routes, by

means of one or more **unmetered**:

(A) Limousines; (B) Extended limousines; (C) Sedan; (D) Extended sedans;

(E) Sport utility vehicles; (F) Extended sport utility vehicles; (G) Other vehicles

with a capacity for seating and transporting no more than 15 persons for hire

including the driver; or (H) Any combination of subparagraphs (A) through (G) of

this paragraph on the basis of telephone contract or written contract. **A limousine**

**carrier shall not use per capita rates or charges.**" (emphasis added).


29.

The Uber Defendnats' vehicles are **metered**. The smartphone apps work as a

meter, measuring time and distance, and charging accordingly.  The Uber

smartphone app simply functions as a technologically advanced version of the

taximeter. Neither the Uber Defendants' UberX nor Uber Black vehicles operated

as limousines and were subject to Atlanta Taxi Ordinances Sec. 162-26 et seq. as

vehicles for hire when using the smartphone app to calculate fares.

30.

In the City of Atlanta, the regulations of taxicabs includes a limitation on the number of available licenses for taxicabs, called CPNC's (Certificate of Public Necessity and Convenience), to 1600 licenses. These CPNCs may be resold by the holders at market prices. CNPCs have been sold by the City of Atlanta and private owners at variable market prices over the years. The City of Atlanta provides heavy fines and jail sentences for persons who operate a taxicab in the city without a CPNC.

31.

Licensed taxicab drivers who operate in the City of Atlanta primarily rent the use of a CPNC from a CPNC owner at a price of approximately $160.00 per week, which amounts to approximately $8,000.00 per year. In return for this price, drivers are guaranteed exclusive access to the Atlanta taxicab market and fares originating in the City of Atlanta and the Atlanta Airport.

32.

In order to comply with most local (including Atlanta's) regulations, taxicabs must be conspicuously decorated with various decals, lights, radios, taximeter, and other equipment specified by the respective local jurisdiction and/or taxicab company. This results in taxicabs having a rather conspicuous, inelegant

appearance both inside and outside the vehicle. Also, due to the lower fares charged by taxicabs, and the smaller profit margin, coupled with the enormous demands upon the vehicle in continuous city driving conditions, taxicab vehicles are usually not luxury models. The private cars used by Uber do not have expenses of complying with taxicab ordinances and limousine laws making them cheaper to operate and charge lower fares.

33.

O.C.G.A § 40-1-151(4) requires that no vehicle for hire may be operated as both a taxicab and a limousine. The same statute also provides that a limousine is unmetered. The Uber Black vehicles and SUVs operate as both.

34.

Virtually all taxicab drivers in the Atlanta metro area derive their entire income from either a portion of the fares collected, or the proceeds of the fares collected after expenses. If a driver collects fewer fares, the driver earns less money.

35.

In 2012, Uber announced service in the metropolitan area of Atlanta, Georgia.  Uber's stated operational territory in the Atlanta area consists roughly of an area which circumscribes the City of Atlanta. This territory includes most or all

of Fulton, Cobb, and DeKalb counties and is bordered by the cities of Cartersville,

Douglasville, Newnan, Griffin, Covington, Lawrenceville, Cumming and Canton.

36.

The Uber Defendants  represent to the public on their website that it

provides transportation for hire using a provided smart-phone app. Uber advertises

its "services" with a very aggressive "viral" marketing campaign, which includes

compensating any number of individuals to act as organizers and to post "reviews"

of its service on internet social media such as Facebook and Twitter. Said posts are

allegedly falsely presented as though they were made by uncompensated

individuals offering unbiased testimonials.

37.

The Uber Defendants  "hire" drivers allegedly as independent contractors to

provide the advertised service, where the driver provides his or her own vehicle.

Uber outfits these drivers with a cell phone preprogrammed turnkey system that

allows the drivers to provide metered service virtually identical to a taxicab. The

primary distinction is that taxicab meters are physically connected to the vehicle's

speedometer, are certified and sealed by the appropriate regulatory body, and are

routinely inspected by same. Uber's "meter" app is not approved by any regulatory

agency, and runs entirely from Global Positioning Satellite (GPS) signals built into

the Uber driver's smart phone. Both methods measure time and distance for the for-hire transportation.

38.

Trips can be arranged by passengers directly through Uber. At the conclusion of the trip, Uber Defendants and the Defendant Class collect the tariff (fare) by billing the passenger's credit card based on data collected by the meter app. Uber pays the drivers their portion of earnings at routine intervals (upon information and belief drivers are paid weekly).

39.

The Uber Defendants  also entice limousine carrier drivers to operate their vehicles as metered taxicabs, in direct violation of statutory restrictions. Many of the Uber drivers (i.e. UberX drivers and members of the Defendant Class) do not pose as limousine carriers and do not provide commercial insurance covering passengers for bodily injuries, thus avoiding expenses of a licensed, legal taxicab or limousine.

40.

Uber's advertising campaign has also directly violated regulatory state statutes to the extent that it poses as a limousine carrier, but does not comply with the

statute requiring all advertisements to disclose the address and license number of the licensed carrier. In the fine print when convenient, Uber even disclaims being a limousine carrier making the ridiculous claim that it is merely a referral service while all the time hiring and firing drivers, rating customers, collecting all fares and managing the minute to minute operations of the driver and his/her car.

41.

All licensed taxicab drivers in the metropolitan area of Atlanta, Georgia are harmed by the Defendants' methods in the form of lost revenue. All "metered" trips measured by time and distance originating in the City of Atlanta conducted by the Uber Defendants and the Defendant Class are exclusively the province of licensed taxicabs with a CPNC, and  the Defendants have appropriated this business and concomitant revenue.

42.

The Uber Defendants  "hire and fire" their drivers; directly collect all fares through customers' credit cards; pay the drivers out of the fares collected at a later date; advertise "metered" transportation; provide minimal training; and otherwise control how its drivers provide service to Uber's customers. The Uber Defendants maintain that its drivers including all members of the Defendant Class are

24

independent contractors making it necessary to individually name the

manager/driver defendants and the Defendant Class. The driver members of the

Defendant Class are aware of the Uber Defendants' position that they are

independent contractors and have challenged Uber legally and by protest to include

them as employees of Uber.

43.

Uber's management has been openly critical of any regulation in general and

manipulated the enforcement of existing laws and the passage of new laws.    Uber

attempts to spin any criticism as "anti-technology" and is willing to say whatever it

needs to at any given moment to achieve Uber's economic goals.  In Atlanta, the

Uber Defendants and Defendant Class have knowingly violated and/or ignored

ordinances of the City of Atlanta pertaining to taxicabs and Georgia laws regarding

limousines.

44.

The Uber Defendants and the Defendant Class have intentionally operated in

Atlanta outside of any laws or regulations thus endangering, harming, hurting,

inconveniencing or damaging the riding public generally without the public's

participation and specially damaging the Plaintiffs and Plaintiff Class. The Uber

Defendants and the Defendant Class have endangered and inconvenienced the

public by the following, but not limited to, actions and failures which have affected ordinary, reasonable members of the public:

a.)  failing to provide adequate insurance or commercial insurance thus requiring the State of Georgia to enact new laws. Additionally, many of the Uber drivers', particularly Uber X drivers', personal insurance has provided no coverage for paying passengers;

b.)  failing to provide safety training for drivers;

c.)  failing to provide any inspection of vehicles used to transport passengers;

d.) false advertising comparing it to licensed lawful taxicabs or limousines;

e.)  failing to provide transportation to handicapped;

f.)  failing to provide adequate background checks on drivers including fingerprints;

g.)  failing to require additional licensing for drivers and the Defendant Class;

h.)  advertising rates lower than taxicabs and including unknown additional charges such as fees for identification checks and surge pricing;

i.)  doubling, tripling, quadrupling and higher multiples of fares on holidays, busy times of days and when it chooses;

j.)  drivers taking unnecessary longer routes to increase fees;

k.)  drivers carrying guns and other concealed weapons;

l.)  drivers staging vehicles near businesses with potential customers without a scheduled trip or fare;

m.) drivers operating under the influence of drugs or alcohol and no inspection by managers before sending drivers to meet passengers;

n.) failing to provide adequate signage to identify Uber vehicles thus requiring new laws;

o.) rating passengers;

p.) representing Uber and its Drivers as public transportation when it avoids any laws regarding such;

q.) failing to pay proper sales taxes; and,

r.) additional actions or inactions to be described through discovery.

## COUNT I

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND CONSPIRACY

45.

Plaintiffs incorporate paragraphs 1 through 44 as if fully set forth herein.

46.

Prior to beginning operations in Atlanta, the Uber Defendants had met strong opposition from the taxicab industry and regulators in other cities and states including but not limited to Washington, D.C., Chicago, New York, Boston, Houston, San Francisco, North Carolina and Los Angeles.  The Uber Defendants were aware of Georgia laws regarding limousines and taxicab ordinances in the City of Atlanta which would apply to their drivers and their business once operations began. Members of the Defendant Class including Keith Radford were also aware of these requirements including that Uber should register as a taxicab or limousine company, pay taxes, obtain proper insurance and comply with all safety standards and inspections. Some members of the Defendant Class were licensed limousine drivers or taxicab drivers before working for the Uber Defendants. The Uber Defendants and the Defendant Class knew that operating a metered limousine or a vehicle for hire not regulated by the state in the City of Atlanta without a license or CPNC is/was illegal but chose to knowingly violate these legal requirements.  All Defendants and the Defendant Class had knowledge that their conduct would do harm to the Plaintiff Class and Subclasses in that they would purposefully take business away from Plaintiffs and the Plaintiff Class reducing revenues and resulting in damages to rental and property values of CPNCs. This is

Uber's business plan – to virtually eliminate the taxi business in Atlanta. Each member of the Defendant Class intentionally managed and/or intentionally drove their unlicensed vehicles in the city of Atlanta and accepted fares from customers they knew would use a taxicab or limousine if not for their service.

47.

In the Spring and Summer of 2013, over 25 Uber Drivers who are members and/or representatives of the Defendant Class were charged with violations of Atlanta taxicab laws and were defended in Municipal Court by lawyers furnished by Uber. They argued then that they were only subject to the state of Georgia's laws regarding limousine carriers and such arguments were rejected by the court. They are also subject to city ordinances. While some Uber Black vehicles may operate lawfully as limousines at times, Uber X which comprise the great majority of  Uber vehicles did not attempt to comply with any state laws or city ordinances for limousine carriers or taxicabs.

48.

The Uber Defendants have hired lobbyists to influence city and state officials to avoid regulation and legal enforcement of regulations that apply to the Uber Defendants and the Defendant Class. This activity demonstrates the Uber

Defendants' knowledge and intent to harm the Plaintiffs and the Plaintiff Class.
These activities have resulted in the City of Atlanta and the State of Georgia failing
to enforce laws and ordinances applicable to them and caused confusion as to
which agencies should be responsible for policing the Uber Defendants' and the
Defendant Class' activities. The policing of Uber's activities have been made even
more impossible in that they purposely  use a variety of private unmarked motor
vehicles which cannot be identified as Uber vehicles without first stopping them.
The members of the Defendant Class have flooded the market with hundreds if not
thousands of illegal vehicles for hire which cannot be policed properly and thereby
intentionally taking business that would otherwise go to the Plaintiffs and Plaintiff
Class.

49.

The Uber Defendants and the Defendant Class have caused third parties such
as the enforcement arms of the state and city governments not to fulfill their
business obligations and relationships to protect the rights and privileges of
licensed, legal operators of vehicles for hire who are members of the Plaintiff Class
and Subclass 2 and owners or renters of CPNCs who are also members of the
Plaintiff Class and Subclasses. All members of the Plaintiff Class and Subclasses

have been damaged as the result of this activity. The regulatory bodies such as the Atlanta Taxicab Bureau or the Department of Public Safety cannot award damages to Plaintiffs and the Plaintiff Class as the result of the Uber Defendants' and the Defendant Class' activities.

50.

The Uber Defendants and the Defendant Class have caused third parties who use the services legally provided by the Plaintiff Class and Subclasses for transportation to use Defendants' rogue services resulting in lost business relationships with these customers and contracts for hire to use Plaintiffs' services which have proximately caused damage to the Plaintiff Class by decreased revenues, rents, rental values of CPNCs and loss in value of CPNCs. The CPNC owners have lost available taxicab drivers as the result of Uber. The CPNCs provide the exclusive right to charge customers for rides originating in the City of Atlanta for trips measured by time and distance and charged at the end of the trip. The Defendants have ignored these rights proximately causing damages as described in this Second Amended Complaint.

51.

The Defendant Keith Radford has continued to manage and operate Uber and the Defendant Class despite knowledge of all of the facts and allegations set forth above. He has actively conspired with the named representatives and members of the Defendant Class to break the laws of the State of Georgia and the City of Atlanta all the while knowing that Plaintiffs would be damaged as described herein as a result of his conduct and intentionally proximately causing such damages.

52.

The Uber Defendants and the Defendant Class have knowingly interfered with the relationship between the Plaintiff Subclasses causing less use of CPNCs and less time of use and rents of CPNCs. The Uber Defendants have knowingly interfered with the relationships between the Plaintiff Subclasses by enticing and hiring licensed taxicab and limousine drivers as Uber Drivers with false promises of increased income proximately causing damage and harm to the Plaintiff Class.

53.

By operating a *de facto* taxicab business in the Atlanta area in violation of state and municipal regulations, Defendants have purposefully, improperly, and

without privilege, induced third parties mentioned above not to enter into or continue business relationships with Plaintiffs. By avoiding the costs associated with legitimate licensed taxicabs including but not limited to owning and/or renting a CPNC issued and sold by the City of Atlanta, proper insurance, safety regulations, sales taxes and regulated fares, Defendants offer and collect lower fares. Defendants conspired with one another and acted in concert to proximately cause harm to Plaintiffs, the Plaintiff Class and Subclasses as described in detail throughout this Second Amended Complaint. The Uber Defendants and Keith Radford and other local managers intentionally operated outside of the law and the driver members of the Defendant Class all intentionally drove their vehicles and collected fares which proximately caused the damages alleged in this Second Amended Complaint. Their activities combined to cause harm creating a conspiracy and making them joint and severally liable for all damages described herein. These tortious activities continued unlicensed and unabated until July 1, 2015.

54.

The wrongful operation of Defendants' business contrary to state and municipal regulations (which Defendants cause government officials not to enforce) has proximately caused Plaintiffs financial injury.  All owners of CNPCs

and members of Subclass 1 as defined in paragraph 14(a) above have suffered damages in that their CPNCs have lost substantial value and marketability. All members of Subclass 2 as defined in paragraph 14(b) above have suffered damages in that the rental value of their CPNC has been diminished due to the dilution of the Atlanta market by improperly increasing the amount of vehicles available to the public against all policies of the City of Atlanta. All members of the Plaintiff Class have suffered lost revenues, business income and damages due to the wrongful conduct of the Uber Defendants and Defendant Class to prevent potential taxicab passengers and customers from using their services.

55.

Some members of Plaintiff Subclass 2 do not own a CPNC. Instead, they pay weekly or monthly rent pursuant to agreements with members of Plaintiff Subclass 1 or Taxicab companies. The Uber Defendants and the Defendant Class of alleged independent contractor drivers and managers including Mr. Radford have wrongfully interfered with these business relationships as described above for the use of CPNCs and conspired with one another to implement the schemes to destroy the taxicab business in the city of Atlanta and take fares from Plaintiffs proximately causing Plaintiffs damages

56.

The Uber Defendants and Defendant Class herein, by improper action and wrongful conduct, without privilege, conspired with each other to create a plan, scheme and design whereby the Uber Defendants and managers including Mr. Radford would hire and use drivers without CPNCs as required for trips originating in the City of Atlanta or without complying with the regulations and laws pertaining to limousines, taxicabs or taxicab companies. Each of the driver members of the Defendant Class intentionally, consciously and with knowledge they were taking fares from the Plaintiff Class  drove their vehicles and collected fares calculated by the Uber Defendants.

57.

The Uber Defendants' and Defendant Class' actions as described above were purposeful and done with malice and with the intent to injure the Plaintiffs by actively interfering with the CPNCs by illegally increasing the number of vehicles for hire in the City of Atlanta with full knowledge of the consequences of their conduct.

58.

The purposeful action taken by the Uber Defendants and Defendant Class was with malice and with the intent to take clients away from Plaintiffs and the

Plaintiff Class with the knowledge that their intentional acts would injure them financially and proximately cause Plaintiffs' damages.

59.

The Uber Defendants and the Defendant Class by their wrongful actions described herein proximately caused damage to the rental value of the CPNCs by diluting the market with an increase of vehicles for hire in the City of Atlanta by more than double the permitted amount.

60.

The unauthorized conduct by the Uber Defendants and Defendant Class is intentional interference with business relationships that Plaintiffs have with their existing CPNC owners or renters and the City of Atlanta and due to their conduct, proximately caused damage to the Plaintiffs and Plaintiff Class and Subclasses in an amount to be proven at trial.

## **COUNT II**

## **PUBLIC OR , ALTERNATIVELY, PRIVATE NUISANCE**

61.

Plaintiffs incorporate paragraphs 1 through 60 as if fully set forth herein.

62.

The actions described above with particular emphasis on those described in paragraph 20 a thru k, constitute(d) a public nuisance under Georgia law in which the public did not participate. The public did not participate in the planning, implementation or operations of Uber and the Defendants other than accepting rides which does not qualify as participation or any responsibility in any way for the described public nuisance.

63.

The actions of the Defendants proximately caused hurt, inconvenience or damage to all Plaintiffs and the Plaintiff Class. The damages hurt and/or inconvenience of Plaintiffs and the Plaintiff Class described in this Second Amended Complaint would affect any ordinary, reasonable person.

64.

The actions of the Defendants specially damaged Plaintiffs and the Plaintiff Class as described in this Second Amended Complaint including loss in market value and rental values of their CPNCs; loss of full use and enjoyment of the CPNCs to be determined by a jury; and, loss of income including fares originating in Atlanta measured by the amount collected for such fares by Uber until July 1,

2015. All owners of CNPCs and members of Subclass 1 as defined in paragraph 14(a) above have suffered special damages in that their CPNCs have lost substantial value and marketability. All members of Subclass 2 as defined in paragraph 14(b) above have suffered special damages in that the rental value of their CPNC has been diminished due to the dilution of the Atlanta market by improperly increasing the amount of vehicles available to the public against all policies of the City of Atlanta. All members of the Plaintiff Class have specially suffered lost revenues, business income and damages all of which were proximately caused by the Defendants entitling the Plaintiffs and the Plaintiff Class to all damages described as the result of the public nuisance maintained by Defendants.

65.

Alternatively, the actions described in this Second Amended Complaint constitute(d) a private nuisance under Georgia law by interfering with Plaintiffs' property rights in CPNCs and property rights of the Plaintiff Class proximately causing all damages described above in paragraph 64 and in this Second Amended Complaint entitling Plaintiffs and the Plaintiff Class to all damages described including the loss of the full use and enjoyment of their property.

38

## COUNT III

## PUNITIVE DAMAGES

66.

Plaintiffs incorporate paragraphs 1 through 65 above as if fully set forth herein.

67.

As described above, Defendants have evidenced an entire want of care and a conscious disregard for the rights of the Plaintiffs and the Plaintiff Class entitling them to punitive damages due to Defendants' outrageous conduct in an effort to intentionally take business from Plaintiffs and Plaintiff class by operating non licensed vehicles for hire and to decrease the value of assets of the Plaintiffs. Defendants' actions further evidence a private or public nuisance and a conscious disregard for the rights of the Plaintiffs and Plaintiff Class entitling the Plaintiffs to punitive damages. The amount of punitive damages shall be determined by the impartial conscience of a fair-minded jury.

## **COUNT IV**

## **UNJUST ENRICHMENT**

68.

Plaintiffs incorporate paragraphs 1 through 67 above as if fully set forth

herein.

69.

No legal contract exists between Plaintiffs or the Plaintiff Class and Uber

and/or the Defendant Class which allows Defendants to collect fares for trips

originating in the City of Atlanta based on measured time and mileage and retain

the same. Such fares are the exclusive property of the Plaintiffs through the use and

ownership of CPNCs. Further, there are no contracts between any of the members

of Plaintiff Class and the Defendants to use any CPNCs.

70.

Plaintiffs have conferred financial benefits on Defendants in that Defendants have operated without CPNCs or the payments for the use of CPNCs which benefits Defendants have retained.

71.

As a result, the Uber Defendants and the Defendant Class have been unjustly enriched by their conduct in the total amount of all fares received for trips originating in the City of Atlanta which are based on measured time and distance which require a CPNC to collect. Alternatively, Defendants have been unjustly enriched by the customary amounts charged for the use of CPNCs which is measured by the number of Uber vehicles originating rides in the City of Atlanta times the monthly or weekly rental values of the CPNCs.

72.

Defendants, as a matter of equity, should be required to return the benefit bestowed upon them by Plaintiffs and the Plaintiff Class and Subclasses by awarding damages for all fares charged for rides originating in the City of Atlanta or the periodic rental values of CPNCs from the time Uber first operated in Atlanta until July 1, 2015.

## COUNT V

## BAD FAITH

73.

Plaintiffs incorporate paragraphs 1 through 72 as if fully set forth herein.

74.

Defendants' conduct has been in bad faith and has caused Plaintiffs unnecessary trouble and expense entitling Plaintiffs to damages including but not limited to attorney fees and expenses pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Plaintiffs pray as follows:

1)     That Summons be issued and Defendants be served with a copy of this Second Amended Complaint as provided by law where necessary;

2)     That Plaintiffs have a trial by jury;

3)     That Plaintiffs recover under Count I of this Second Amended Complaint;

4)     That Plaintiffs recover under Count II of this Second Amended Complaint;

5)      That Plaintiffs recover under Count III of this Second Amended

Complaint;

6)      That Plaintiffs recover under Count IV of this Second Amended

Complaint;

7)       That Plaintiffs recover under Count V of this Second Amended

Complaint;

8)       For such other and further relief as this Court deems just and proper

under the circumstances.


Respectfully submitted this 15th day of June, 2015.

/s/  William A. Pannell
William A. Pannell
Georgia Bar No. 561025
WILLIAM A. PANNELL, P.C.
433 Chateau Drive, NW
Atlanta, Georgia 30305
TEL (404) 353-2283
FAX (404)237-2384

Keith E. Fryer
Georgia Bar No. 279037
FRYER, SHUSTER & LESTER, PC
1050 Crown Pointe Parkway, Suite 410
Atlanta, GA 30338-7701
TEL (770) 668-9300
FAX (770) 668-9465
Of Counsel

LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing pleading filed with the Clerk of Court has been prepared in 14 point Times New Roman font in accordance with Local Rule 5.1(C).

Dated: June 15, 2015.

/s/ William A. Pannell
William A. Pannell

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2015, I filed a copy of the foregoing document using the Court's ECF/CM system, which will automatically send notice of such filing to counsel for Defendants:

Michael W. Tyler (GA Bar No. 721152)
mtyler@kilpatricktownsend.com
John P. Jett (GA Bar No. 827033)
jjett@kilpatricktownsend.com
Ross D. Andre (GA Bar No. 280210)
randre@kilpatricktownsend.com
**Kilpatrick Townsend & Stockton LLP**
1100 Peachtree St. NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

Stephen A. Swedlow
stephenswedlow@quinnemanuel.com

Amit B. Patel
amitbpatel@quinnemanuel.com
**Quinn Emanuel Urquhart & Sullivan, LLP**
500 W. Madison St., Suite 2450
Chicago, IL 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Arthur M. Roberts
arthurroberts@quinnemanuel.com
**Quinn Emanuel Urquhart & Sullivan, LLP**
50 California St., 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Dated:  June 15, 2015.

*/s/  William A. Pannell*
William A. Pannell